

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 DEC -6 AM 2: 00

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 99-238** |
| **v.** | * | **SECTION: "N"** |
| **SIDNEY JOSEPH** | * | |

*　　*　　*

## ANSWER AND INCORPORATED MEMORANDUM
## TO DEFENDANT'S PETITION UNDER
## 28 U.S.C. § 2255 TO VACATE SENTENCE

**NOW INTO COURT** comes the United States of America through the undersigned

assistant United States attorney and with respect requests that this Court deny the ten

claims raised by the petitioner in this petition filed pursuant to Title 28, United States Code,

Section 2255:

## I.　　Facts Surrounding the Offenses:[1]

On April 2, 1999, Sidney Joseph entered Hibernia National Bank in New Orleans,

approached a teller, aimed a gun an inch or two from her face and screamed, "Just give

me that, that, that," referring to the cash on the counter and in her drawer. 4 2nd Supp.

R.A. 116-25; see id. at 140-43, 148-50. The teller gave Joseph the cash and a dye pack.

---

[1]　References to the Record, Supplemental Record and Second Supplemental Record are designated as "R.A.\_\_," "\_\_Supp. R.A. \_\_," and "\_\_ 2nd Supp. R.A.\_\_," respectively, corresponding to the applicable volume and page of the record. References to trial exhibits are designated as "Gov. Ex. \_\_" and "Def. Ex. \_\_," corresponding to the applicable government or defense exhibits. The one government attachment is identified as government annex 1.

\_\_ Fee_____
\_\_ Process\_\_\_\_\_
X Dktd_____
✓ CtRmDep\_\_\_\_\_
\_\_ Doc. No.\_\_\_\_\_

Id. at 119. Joseph continued screaming and brandishing the gun as he left the bank. Id. at 120, 126-28, 141-42, 150-53. The stolen, dye-stained cash, totaling $2,689, was found near the bank. Id. at 169-76.

On the morning of February 2, 2000, Joseph displayed a firearm to a long-time acquaintance and demanded his Delta 88 automobile. Id. at 177-81. Sporting a white cap, Joseph entered Liberty Bank in New Orleans, confronted the security guard, said he was robbing the bank and commandeered the guard's gun. Id. at 217, 231-36, 242, 249. Joseph then approached Liberty's tellers with both guns drawn, demanded that the tellers place their cash on the counter, made various derogatory comments and instructed the tellers he did not want a dye pack. Id. at 213-22, 236-50. After inspecting the proceeds, Joseph left the bank with $12,170. Id. at 218-21, 237-40, 247; 5 2nd Supp. R.A. 281.

Shortly after the Liberty Bank robbery, a Louisiana state trooper attempted to stop Joseph on Interstate 610 in New Orleans because the Delta 88 had an expired inspection sticker, and its license number was broadcast over the police radio. 5 2nd Supp. R.A. 282-85. A high-speed chase ensued. Id. at 285-87. During the chase, Joseph braked abruptly in an apparent attempt to shoot the trooper. Id. Joseph swung into the median and collided with several vehicles while attempting to reverse direction. Id. at 287-88. He then abandoned the wrecked Delta 88, fired at the trooper and ordered a motorist out of her Honda Accord at gunpoint. Id. at 288-91, 306-08. When the motorist had difficulty with her seatbelt, Joseph dragged her out of the car and fled in the stolen Accord. Id. at 291, 308-11. Because of a flat tire, the trooper was unable to continue pursuit, and Joseph escaped. Id. at 291-92.

A search of the abandoned Delta 88 revealed the security guard's gun, a bulletproof vest, a white cap and Joseph's fingerprints. Id. at 405-12, 421-26, 435-40; see 4 2nd Supp. R.A. 181-86, 249-52. Joseph's fingerprints also were found on the Accord after its recovery. 5 2nd Supp. R.A. 428-30, 440-42.

On May 19, 2000, Joseph entered Fidelity Homestead Association in New Orleans, pointed a gun at employees, demanded money and made various derogatory remarks. Id. at 329-36, 346-48, 356-60, 363. Joseph instructed tellers not to give him a dye pack. Id. at 337, 360. After grabbing the cash, Joseph demanded a teller's car keys. Id. at 338, 361. The teller said she did not own a car. Id. at 338, 361-62. Joseph responded, "Bitch, you are a liar. You drive that red Cavalier out there." Id. at 338, 340; see id. at 361. The teller relinquished her keys, and Joseph fled in the Cavalier with $12,061. Id. at 338-49, 361-66, 368-69.

Joseph was apprehended February 15, 2001, at a New Orleans hotel. Id. at 375-76, 381-84. After Joseph said a weapon was present in the room, authorities located a .9 millimeter semiautomatic handgun on the bed. Id. at 382-84.

At trial, numerous witnesses identified Joseph as the robber and provided details of the three robberies through bank surveillance photographs. 4 2nd Supp. R.A. 120-29, 144-53, 215-22, 240-50; 5 2nd Supp. R.A. 343-50, 362-66. A long-time acquaintance reviewed the surveillance photographs and identified Joseph as the robber. 4 2nd Supp. R.A. 186-91. The driver of the carjacked Accord identified Joseph as the carjacker. 5 2nd Supp. R.A. 315-16, 322-27. Joseph was wearing a black jacket and yellow boots during the final bank robbery and at the time of his arrest. 5 2nd Supp. R.A. 361, 365, 370-72.

3

## II.  **Course of Proceedings Below**:

On July 30, 1999, a federal grand jury indicted Sidney Joseph ("Joseph") with one count of bank robbery in violation of 18 U.S.C. § 2113(a).  R.A. 291-92.  On April 6, 2001, the indictment was superseded to add the following charges:  Two additional counts of bank robbery in violation of 18 U.S.C. § 2113(a); three counts of brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii); four counts of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); two counts of carjacking in violation of 18 U.S.C. § 2119; and one count of possession of a firearm with an obliterated serial number in violation of 26 U.S.C. §§ 5842, 5861(h) and 5871.  R.A. 244-50.  Joseph pleaded not guilty to all charges.  R.A. 240, 261.

Prior to trial, the government filed a notice of intent to admit Joseph's statement during his arrest when asked if he possessed a weapon, along with various admissions to a Louisiana state trooper.  R.A. 234-39; see also R.A. 178-89.  In response to the weapons question and without the benefit of <u>Miranda</u> warnings, Joseph replied, "No, sir, not on me. There's one in the room." 2 2nd Supp. R.A. 5.  Joseph moved to suppress the statements, contending that the weapons statement was fabricated and obtained without advisement of his rights and that the admissions to the state trooper were coerced.  R.A. 207-18; see R.A. 190-98.

At the suppression hearing, the FBI agent who had inquired about weapons testified agents had been told during an operational briefing that Joseph possessed a weapon in preparation for another bank robbery. 2 2nd Supp. R.A. 7.  The agent also was concerned

4

because the hotel room had not been cleared, and agents had not verified that Joseph was its only occupant. Id. at 9, 11-13. As the agent testified, "My first concern was the safety of everyone involved, including [Joseph's] safety. Once I determined he did not have a weapon on him, I had no intention of questioning him about anything. I was charged with – that wasn't my assignment." Id. at 12.

Because the agent was seeking to establish the safety of the room and determine whether Joseph was its only occupant, the district court admitted Joseph's admission under the public safety exception to Miranda. Id. at 14; R.A. 109. Conversely, the district court suppressed Joseph's admissions to the state trooper, noting the potential for abuse because the trooper had been a victim of one of Joseph's crimes. 2 2nd Supp. R.A. 35-36; R.A. 109.

At Joseph's request, the district court twice continued the trial date, first to accommodate a scheduling conflict of his counsel and second to permit a competency hearing following Joseph's belated motion. R.A. 107, 112-14, 254-55, 257-58. Joseph's counsel first raised questions about Joseph's competence to stand trial at 3 p.m. on the Friday before the scheduled Monday trial date, contending his client had been uncooperative and had threatened to disrupt the trial. R.A. 145-46. Joseph also sought an evaluation of whether he was sane at the time of his offenses, but the district court denied the motion as untimely. R.A. 116-19.

Nine witnesses testified at the May 15, 2001, competency hearing. R.A. 102-05; 3 2nd Supp. R.A. 2. Among other things, the district court heard testimony that Joseph

5

consistently was observed behaving normally, responding appropriately to law enforcement requests and engaging in appropriate conversations regarding various aspects of his upcoming trial and other matters.  3 2nd Supp. R.A. 8-9, 15-17, 19-26, 32-35, 40-42, 47-52.

Joseph's behavior changed markedly as trial approached and he learned he would be evaluated by a psychiatrist. Id. at 17-18, 26-27, 30-31, 35-36.  Shortly before his initial evaluation, Joseph told a deputy marshal, "I don't have anything to say to the doctor.  I don't want to talk with him.  I'm not going to trial." Id. at 18.  Another deputy marshal recalled Joseph remarking, "Bro, you might as well take me back.  I'm not answering any questions.  I've got nothing to say to him.  I'm not doing anything.  I'm not cooperating." Id. at 40.  Joseph then ignored the psychiatrist, laughing and reclining on the floor and a bench during the attempted evaluation. Id. at 18, 31, 39-40.[2]

The day of Joseph's second evaluation, he also engaged in rational discourse and responded appropriately to law enforcement requests but then laughed and refused to cooperate with the two psychiatrists who attempted to evaluate him.  3 2nd Supp. R.A. 18-28, 32-36.  As one deputy marshal observed, "They were attempting to ask him questions.  He wasn't really even looking at them most of the time.  He would turn away and just laugh." Id. at 35.

---

[2]    The district court initially asked Dr. Rennie Culver to evaluate Joseph to determine the potential for disruption or dangerousness and "whether he was psychotic or mentally incapable of standing trial, or whether he was just being difficult and obstreperous."  2 2nd Supp. R.A. 38; see R.A. 145-46.  "The doctor said that the defendant was uncooperative, but that he felt that he was trying to manipulate the system and that he was mentally fit to stand trial."  2 2nd Supp. R.A. 38.  "Out of an abundance of caution and due to the public defender's late, frantic insistence that perhaps the failure to cooperate was incompetence," the district court then ordered a second evaluation by Dr. Culver and a psychiatrist chosen by the defense, Dr. Sarah Deland, and a full competency hearing.  3 2nd Supp. R.A. 89; R.A. 107.

The district court also heard testimony that from early on, Joseph was uncooperative and disruptive with both court-appointed attorneys. Id. at 57-62, 66-67.[3]

Because of Joseph's refusal to cooperate, neither psychiatrist was able to reach a definitive conclusion about Joseph's mental state. 3 2nd Supp. R.A. 68-81. Following the testimony of seven lay witnesses, however, one psychiatrist observed:

> I think the man can probably turn the cooperation on and off, but the only concern I have at this point on that issue is whether there is some kind of underlying paranoid process going on that would cause him to perhaps, say, not trust me or not trust Dr. Deland or some psychiatrist or even the first attorney who went to him, or even his present counsel, whether there might be some underlying paranoia.

> Usually, however, patients who are paranoid show more obvious suspiciousness and guardedness and tend to be more withdrawn, at least this has been my experience and observation, and tend to be more hostile rather than just "I'm not going to talk to you," that sort of thing. I have examined a lot of paranoid people and usually they look a bit different; in fact, sometimes quite different from this. This comes across as more of a passive-aggressive kind of behavior.

Id. at 80.

The district court found Joseph competent to stand trial, noting he "has voluntary control over being cooperative or not being cooperative," and "there's been no evidence of mental illness." Id. at 86-89; see R.A. 102-03. Further:

---

[3]    John Craft, an experienced Assistant Federal Public Defender, initially was appointed to represent Joseph, but Joseph immediately began to complain about his counsel. 3 2nd Supp. R.A. 57-62; see R.A. 263, 267, 269-72; 2 Supp. R.A. 2. Craft was allowed to withdraw and was replaced by Criminal Justice Act Panel Member George Chaney, Jr., who filed six pre-trial motions on Joseph's behalf and several motions to retain experts at the government's expense and obtained the suppression of inculpatory admissions to the state trooper, the assistance of two expert witnesses and the exclusion of a government demonstrative exhibit. R.A. 45-48, 82-84, 92-94, 100, 109, 131-33, 135-37, 139-43, 148-49, 151-57, 159-62, 164, 199-218, 251-53, 263, 267, 269-72; 2 Supp. R.A. 2.

I think he knows very well what is going on. I think if he voluntarily decides not to cooperate with the United States Public Defender's Office, that is his voluntary decision. It's not a good decision, but that's a decision he has made. It's to be uncooperative.

3 2nd Supp. R.A. 89.

The United States Marshals Service recommended use of a stun belt during trial after learning Joseph planned to be "extremely disruptive" and because of concerns about his history of violence and whether he might attempt escape because of the seriousness of the charges against him. Id. at 20, 42; see R.A. 145-46. The district court observed Joseph had threatened to turn over a table and physically resisted deputy marshals assigned to bring him to the courtroom. R.A. 47; 3 2nd Supp. R.A. 88-89. The belt was hidden from the jury and not activated. R.A. 47.

Trial commenced May 21, 2001, before United States District Judge Edith Brown Clement. R.A. 77-78. At a hearing outside the presence of the jury on the morning of trial, the district court denied Joseph's request to fire his second court-appointed counsel for lack of good cause. 4 2nd Supp. R.A. 1-6, 14-15; R.A. 77.[4] Joseph stated that he "would love to represent myself" but was not prepared to do so, yet he also would not allow Chaney to represent him. 4 2nd Supp. R.A. 5-8, 14-15. Joseph invoked his right to self-representation against the advice of the district court during the guilt phase of the trial, which urged:

I seriously recommend to you that you allow Mr. Chaney and his assistant to represent you – don't talk, I'm talking – because they are very good lawyers.

---

[4] Before sentencing, Joseph made yet another demand for appointment of new counsel, which the district court again denied, finding Chaney had represented Joseph well throughout the proceedings. R.A. 45-48, 50-54. Defense counsel Chaney represented the petitioner post-conviction at his sentencing hearing.

8

Id. at 5, 7-8, 10. Prior to the commencement of trial, the district court further urged, "[a]gain, I am discouraging you from representing yourself." Id. at 15.

The district court ordered that Chaney remain as stand-by counsel to assist Joseph, reiterating, "[i]t is my strong recommendation to you that you allow him to do the questioning, that you allow him to do the cross-examination, and that you allow him to put on evidence if there is any evidence on your behalf," to which Joseph responded, "Nothing doing. Don't want it. No thank you." Id. at 10.

During the hearing, Joseph exhibited full awareness of the seriousness of the charges against him, arguing, "George Chaney ain't on trial for his life, no 175 years, 13 charges in a federal court system, about what – four, five more in the parish. . . He ain't on trial for his life. I'm on trial for my life." Id. at 15.[5]

During trial, Chaney was required to reassume the representation several times when Joseph was removed from the courtroom. 4 2nd Supp. R.A. 19-21, 88-273. Joseph initially was removed after repeatedly interrupting the district court's instructions at the start of voir dire. Id. at 19-21. After jury selection, Joseph returned to the courtroom but requested and received permission to "leave out." Id. at 86, 89. When absent from the courtroom, Joseph listened to the trial from the marshal's office, paying close attention and commenting disparagingly about the proceedings. Id. at 87-89; 5 2nd Supp. R.A. 277.

On the morning of the second day of trial, Joseph said he again wished to represent himself, and the district court appointed Chaney as stand-by counsel. 5 2nd Supp. R.A.

---

[5]     Joseph also was explained the maximum penalties at his arraignment. R.A. 240.

277-80. Joseph cross-examined several witnesses and exhibited an understanding of the general nature of the proceedings. 5 2nd Supp. R.A. 298-304, 316-22, 327-28, 350-54, 366-67, 373-74, 376-79, 392-98, 413-19, 427, 430-32, 446-47. For example, when one witness testified that the bank robber had a large nose, Joseph pointed out that the witness' FBI interview report made no reference to this identifying feature. 5 2nd Supp. R.A. 351. Joseph established through one witness that the case was considered "high priority," yet pointed out through other witnesses a several-month lapse between Joseph's arrest and the seizure of evidence from him and another lapse between the collection and analysis of fingerprint specimens. 5 2nd Supp. R.A. 303-04, 373-74, 427, 430. Joseph also suggested a discrepancy in law enforcement reports as to the number of fingerprint specimens and questioned a witness about the partial obscurity of a photograph of an envelope used to establish chain of custody. Id. at 395, 415-16, 430.

On the final day of trial, the United States Marshals Service requested the employment of shackles after discovering two homemade knives in Joseph's possession and after Joseph had been verbally and physically combative with authorities. 6 2nd Supp. R.A. 454-56. The district court took precautions to ensure the jury would not see the shackles. Id. at 456; see R.A. 48, 61-62. After direct examination of the second witness, Joseph asked that Chaney be reappointed, and Chaney conducted Joseph's defense for the final witness and closing argument. 6 2nd Supp. R.A. 468-545.

10

Joseph continually was disruptive during the government's closing argument and was removed from the courtroom, at which time the jury observed that he was physically restrained. Id. at 509-12; see R.A. 61-62. The district court cautioned:

> [T]he fact that this defendant has physical restraints placed on him must not be considered by you for any purpose. The restraints are not evidence of guilt, and they must not be considered by you as any evidence he is more likely to be guilty than not-guilty. You must not speculate as to why the restraints have been used, and in determining the issues in this case you must disregard this matter entirely.

6 2nd Supp. R.A. 512.

The jury returned a split verdict, finding the defendant guilty on all counts except for Count 11, carjacking during the Fidelity Homestead Association robbery. R.A. 68-72. The government later sought and obtained dismissal of Count 13, possession of a firearm with obliterated identification. R.A. 29-31.

With an offense level of 30 and a criminal history category of IV, Joseph's applicable sentencing range was 135-168 months for the bank robbery counts (Counts 1, 4 and 8) and the carjacking count (Count 7).[6] The government sought an upward departure of 20 years from the guidelines range. R.A. 42-44. At the sentencing hearing, the district court granted the motion but denied the 20-year departure, instead departing upward two levels to criminal history category VI, resulting in a range of 168-210 months. 3 Supp. R.A. 31-33; R.A. 20. The district court sentenced Joseph at the top of the range, resulting in a 42-

---

[6]    The felon-in-possession-of-a-firearm counts (Counts 3, 6, 10 and 12) were capped at the statutory maximum of 120 months, and the brandishing-a-firearm-during-the-commission-of-a- crime-of-violence counts (Counts 2, 5 and 9) carried mandatory, consecutive seven-year sentences. See Presentence Investigation Report at 18, ¶ 112.

month increase in sentence due to the departure on a total sentence of 462 months. 3 Supp. R.A. 32-33.[7] Joseph was ordered to make restitution to the three robbed banks and was placed on supervised release for a term of five years following imprisonment. R.A. 20.

On September 19, 2001, Joseph filed a timely notice of appeal. R.A. 17-18. That appeal was denied on July 1, 2003, and the U.S. Court of Appeals for the Fifth Circuit affirmed the conviction and sentence for this defendant. On October 27, 2003, the U.S. Supreme Court issued its mandate denying defendant's petition for a Writ of Certiorari. This instant §2255 petition was timely filed on September 17, 2004.

III.    **Defense Counsel Was Not Ineffective Regarding The Prosecution's Presentation Of Firearms Offenses And The Court Properly Admitted Evidence That Handgun Firearms Are Not Manufactured In The State Of Louisiana (Ground One):**

Joseph argues that he received ineffective assistance of pre-trial and appellate counsel for allegedly ignoring Joseph's belief that entities within the State of Louisiana manufacture pistols as firearms. During the trial, the government called Bureau of Alcohol, Tobacco & Firearms Special Agent Michael Eberhardt as an expert witness. Trial transcript Vol. 1, pp. 461-506. Special Agent Eberhardt was qualified as an expert in the interstate nexis of firearms to determine if firearms crossed state lines. Trial transcript Vol. 1, p. 473. After the government proffered this witness and elicited testimony regarding his

---

[7]    Joseph received imprisonment for 210 months as to each of Counts 1, 4 and 8; 180 months as to Count 7; 120 months as to Counts 3, 6, 10 and 12, all terms to run concurrently; and a term of 84 months as to each of Counts 2, 5 and 9 to run consecutively to each and all other counts. R.A. 20, 27; 3 Supp. R.A. 32.

training, education, experience and special advanced training in the interstate nexis of firearms, the Court qualified this witness as an expert in this areà. Trial transcript Vol. 1, p. 473. Joseph's defense counsel was given an opportunity to question Special Agent Eberhardt before the Court found him qualified to testify in this area, and defense counsel availed himself of this opportunity to thoroughly examine the qualifications of this witness. Trial transcript Vol. 1, pp. 469-473.

In the instant petition, Joseph argues that a specific factual error occurred during the testimony of Special Agent Eberhardt when this witness testified ". . .there are no firearms manufactured in the State of Louisiana." Trial transcript Vol. 3, p. 481, Ln. 9. Joseph further objects that the government cited this testimony in closing argument and asserted that the agent had incorrectly established a necessary element that the firearms charged in the superseding indictment affected in interstate commerce.

Joseph attaches Petitioner's Exhibits 1 and 2, which contains a letter response to a Freedom of Information Act request from the Bureau of Alcohol, Tobacco & Firearms listing entities that are licensed to manufacture firearms within the State of Louisiana. Joseph asserts, based on these two exhibits, that Special Agent Eberhardt's testimony is flawed and that his counsel were ineffective in not raising or appealing the existence of licensed handgun firearms manufacturers operating within the State of Louisiana.

It is necessary for the government to supplement the record in this response in order to fully address the new materials raised by Joseph in this petition, which is outside the record of trial. Attached as Government Annex 1, please find an affidavit from Special

13

Agent Eberhardt addressing this issue and stating that 21 entities within the State of Louisiana are licensed to manufacture firearms, but in fact do not manufacture the frame or receiver of pistol firearms, but rather repair firearms and produce component parts to firearms other than the frame or receiver of a firearm. Consequently, the testimony provided by Special Agent Eberhardt that ". . .there are no firearms manufactured in the State of Louisiana[ ]" is correct as it relates to the issue of whether handguns found in the State of Louisiana moved in and affected interstate commerce. Trial transcript Vol. 3, p. 481, Ln. 9. All of the relevant firearms in connection with this case are handguns. See Government Exhibits 23, 26, 29, 31, 54, 55, 63 and 74.

It is important to highlight portions of Special Agent Eberhardt's testimony to demonstrate that Joseph's argument claiming that the agent is factually wrong and that his conviction should be reversed is without merit. During the course of trial, the government introduced two firearms that were connected with the charges in this case. See Trial transcript Vol. 1, pp. 474-477. Initially, the government introduced a Smith & Wesson, Model 10, .38 Special firearm. The firearm was identified as Exhibit 23, and was seized from a security guard during the course of a bank robbery by the defendant. Special Agent Eberhardt examined this firearm and determined that it was manufactured in Springfield, Massachusetts, and met the statutory definition of a firearm. Trial transcript, Vol. 3, p. 474.

Following the introduction of Exhibit 23, the government then showed a Ruger, Model 95 DC .9 mm pistol to Agent Eberhardt. This was a firearm seized from the defendant at the time of his arrest and was identified as Exhibit 63. The agent, as an

14

expert witness, testified that this firearm was manufactured in Prescott, Arizona, and traveled across state lines into the State of Louisiana, and otherwise met all of the statutory definitions of a firearm. See Trial transcript, Vol. 3, pp. 476-478.

The government then utilized photographic and video images to establish that handguns used in the charged offenses met the statutory definition of a firearm, and this evidence is contained in Exhibits 26, 29, 31, 54, 55 and 74. Agent Eberhardt testified regarding the photographic image identified in Exhibit 26 by stating "this photograph depicts a subject holding what is in my opinion a firearm in his right hand and also a firearm tucked underneath his right arm. . .you can see that has the same exact shape and characteristics as Government Exhibit 63 (Exhibit 63 was an actual firearm entered in the case). . .you can see the backstrap and the wooden grips on the side. . ." Trial transcript Vol. 3, p. 481.

Agent Eberhardt then testified regarding Exhibit 29 and stated, "I can see the frame or receiver in some detail underneath that top slide where the top slide attaches to it."

Agent Eberhardt testified regarding Exhibit 31 and stated, ". . .you can see the top slide, the rear site. You can see the differentiation on this one real good between the ejection port and the slide. . .It's either brushed steel or brushed metal. . .[T]he slide on this are bezzled. . .definitely a machine has worked on this side of the slide. . ." Trial transcript, pp. 483-484.

Agent Eberhardt then testified regarding Exhibit 74 and stated, "this one is detailed enough to see the barrel, the front site, the frame of this, the trigger guard and the trigger. That certainly is indicative of a real firearm."

Finally, Agent Eberhardt testified regarding Exhibits 54 and 55. He testified that Exhibit 54, "...depicts a subject holding what I believe to be a firearm. . .You can see the frame or receiver of the firearm just underneath there." Trial transcript, Vol. 3, p. 485. Agent Eberhardt then testified regarding Exhibit 55 and stated ". . .you can see the exact same characteristics I have pointed out, the frame or receiver of the firearm, the slide that goes on top, you can see that, the differentiation between the slide and the receiver and, again, the removable magazine." Trial transcript, Vol. 3, p. 486.

In each instance, Agent Eberhardt, as a qualified expert, testified that both the physically-admitted firearms and the photographic images of the firearms contained sufficient detail to establish that the firearm moved in interstate commerce. The attached affidavit from Agent Eberhardt further elucidates the testimony he provided in court and is consistent with that testimony.

Joseph misconstrues the meaning of the material that he obtained via a Freedom of Information Act request from the Bureau of Alcohol, Tobacco & Firearms. The materials that Joseph obtained shows entities that are <u>licensed</u> to manufacture firearms within the State of Louisiana, but does not establish that such entities actually manufacture firearms. The government's affidavit, supplementing this record, establishes from this same expert witness that the entities in question do not engage in the manufacture of firearms, but rather repair firearms, produce certain component parts for firearms and do not manufacture the critical component of a firearm that meets the statutory test of determining what is a firearm, that is, the frame or receiver of a firearm.

16

Consequently, Joseph's assertion that his trial and appellate counsel were ineffective in raising this factual issue is without merit, and the government presented substantial fact-based evidence, through a qualified witness, that all pistol firearms charged in the relevant counts of the superseding indictment affected interstate commerce.

## IV.    Defense Counsel Was Not Ineffective By Not Filing A Motion To Sever The Title 18, U.S.C. §922(g) Counts  (Ground Two):

Petitioner argues that he suffered ineffective assistance of pre-trial counsel because his counsel did not file for a severance of counts in the superseding indictment charging offenses under Title 18, United States Code, Section 922(g). Petitioner further argues that this represented an improper joinder of offenses and that his appellate counsel failed to raise this issue on direct appeal.

Rule 8 of the Federal Rules of Criminal Procedure permits joinder of offenses or defendants in the same indictment to promote judicial economy. Under Rule 14(a) of the Federal Rules of Criminal Procedure, a trial judge has broad discretion to grant or deny severance of previously joined counts after balancing the interest in judicial economy against the risk of prejudice to the defendant. See U.S. v. Solis, 299 F.3d 420 (5th Cir. 2002).

In Solis, supra, the appellate court held that the trial court may only be reversed for the denial of a severance if the defendant was prejudiced to such an extent that the District Court could not provide adequate protection and the prejudice outweighed the government's interest in economy and judicial administration. In cases involving a single

17

defendant, such as this case, Rule 8(a) of the Federal Rules of Criminal Procedure specifically permit joinder of multiple offenses in the same indictment. Joinder of offenses is permitted under this rule provided: (1) they are of the same or similar character, and (2) the counts form the basis of the same act or transaction, and (3) the charges are based on acts or transactions that are connected or constitute parts of a common scheme. See U.S. v. Bullock, 71 F.3d 171 (5th Cir. 1995).

In Bullock, supra, the appellate court held joinder of bank robbery charges and felon in possession charges were proper, even though the gun forming the basis of the felon in possession charge was not used in the robbery, because possession of the gun was made available to the defendant during the robbery and attempted escape. The facts of Bullock are similar to the instant case and all of the charges in this case, including the bank robberies, carjackings, felon in possession of a firearm charges and use of a firearm in connection with a crime of violence are all part of a single or common scheme undertaken by this defendant and form the basis of one continuance criminal transaction taking place over a period of time, that is, the robberies of banks and stealing of cars through the use of handguns.

Consequently, there is no merit in the argument that trial counsel should have moved for severance of the 922(g) counts and it does not constitute ineffective assistance of appellate counsel to not pursue this matter in the petitioner's appeal.

18

**V.** **Defense Counsel Was Not Ineffective In Participating In Individualized Voir Dire Of A Potential Juror And Defense Counsel Was Not Ineffective By Not Filing Motions Limiting Press Interests In The Case (Grounds Three and Four):**

In petitioner's grounds three and four, Joseph alleges that he suffered prejudice from pre-trial and appellate counsel because he claims that his counsel failed to limit prejudicial pre-trial publicity that impacted his case, and that his counsel failed to seek individual voir dire questioning of potential jurors regarding publicity generated in this case.

Joseph is factually inaccurate in his allegation that his counsel and the Court failed to adequately address pre-trial publicity concerns, and similarly Petitioner fails to meet the test set forth for this Circuit reviewing pre-trial publicity and its impact on the impartiality of a trial. See United States v. Chagra, 669 F.2d 241, (5th Cir.), cert. denied 459 U.S. 846 (1982).

During the trial, the Court, government counsel and defense counsel were keenly aware of the pre-trial publicity received in this case, and the District Court specifically inquired of the entire jury venire, "Let me know if you know anything about the facts of this case other than what I told you this morning. Anybody hear anything about this case or anybody try to talk to you about the case before you got here?" See trial transcript Vol. 1, p. 57, Lns. 16-19. All potential jurors heard this inquiry designed specifically to elicit knowledge of information regarding potential pre-trial publicity.

Only one potential juror responded to the Court's inquiry (juror 32). See trial transcript, Vol 1, p. 57, line 25.

Contrary to Joseph's assertion that the Court did not adequately examine this issue and also contrary to Joseph's assertion that his counsel failed to conduct individual voir dire on this matter, the following transcript excerpt convincingly demonstrates the concern and exhaustive inquiry of this issue by the Court and all counsel:

> THE COURT: You need to come up and we'll go over that. (A reference to Juror 32 hearing pre-trial news on this case)
>
> **(WHEREUPON, the following proceedings were held at the bench.)**
>
> JUROR NO. 32: Chatman, No. 32. I read the paper pretty regularly and I listen to the news, and I've been exposed to that.
>
> THE COURT: Do you remember anything specific about this defendant? I know our paper is always full of unpleasant things.
>
> JUROR NO. 32: What I read was not pleasant about him. But I don't think it would stop me, if there was evidence given that would show his innocence or guilt, I could consider it.
>
> THE COURT: Just tell the lawyers what you remember reading because they might have some questions.
>
> JUROR NO. 32: Well, the carjacking things were read, and I considered him kind of a bad character when I read what he had done, and that flashed in my mind. I remember seeing his picture in the paper. I thought he looked familiar when I saw him. I'm a reasonable man. I think I can consider evidence and be honest, but my initial impression is he is a bad character.

20

THE COURT: The person you read about in the paper was a bad character?

JUROR NO. 32: Yes.

THE COURT: Do you have anything?

MR. MURPHY: Sir, you would hold the government to its burden of proving each element beyond a reasonable doubt?

JUROR NO. 32: Yes.

MR. MURPHY: Including the issue of identity?

JUROR NO. 32: Yes.

MR. CHANEY: Mr. Chatman, you expressed your initial belief is that the person was a bad character and you saw his picture in the paper. Those images, were they such you can put those images aside and decide the case solely on the evidence that's going to be presented here, the testimony and information provided here in Court, and not use anything you learned from any other source outside of the courtroom in making the determination?

JUROR NO. 32: I can try. Yes, I think I can.

MR. CHANEY: I know you say you can try. I need you to give me that you will do it, because during the course of the trial I can't come back and poll you about how you feel.

21

JUROR NO. 32:     In all honesty, when I saw his behavior here, it contributed to that negative feeling that I had about him, and I have to be honest about that. It seems like it reinforced the bad character opinion that I had preformed. I would like to think I could get beyond that. I'm anxious to serve, but that's my feeling.

THE COURT:       That would be a risk to him, you see. You have to be fair to the defendant.

JUROR NO. 32:     I understand.

THE COURT:       That's the way the criminal justice system works. As long as you make the government prove every element - -

JUROR NO. 32:     I can consider evidence.

THE COURT:       You can't cut him any slack because of some feeling you had.

JUROR NO. 32:     No. I can do that.

MR. MURPHY:      If the Judge instructs you you are only to decide this case on the facts admitted and hold the government to its burden of proof beyond a reasonable doubt, could you follow those instructions?

JUROR NO. 32:     I can do that.

THE COURT:       Regardless of whether you appreciated what you read in the paper or not?

JUROR NO. 32:     I can.

THE COURT:       Can you overcome his behavior this morning?

JUROR NO. 32:     I can do that. I think I can.

THE COURT: Are you sure?

JUROR NO. 32: Yes.

THE COURT: We have a whole courtroom full of people. If it's a problem, we need to know.

JUROR NO. 32: I, for one, have been against prejudice my whole life, so I know that I can do this. It's unfair for me to do anything else but cast aside those things. I can do that.

THE COURT: Thank you, sir.

Trial transcript Vol. 1, pp. 57-60.

As is clearly evident from the above record, the Court and all counsel meticulously reviewed the impact of any pre-trial publicity for this potential juror; the only member of the venire who heard any news of this case. Joseph admits correctly in his petition that this potential juror did not ultimately serve as a juror in this case. Consequently, any potential for the impact of pre-trial publicity was completely removed from the trial.

Unquestionably, there was no prejudice to the petitioner in the careful review of this issue by the Court and all counsel. In addition to the very detailed inquiry on pre-trial publicity listed above, the Court advised all potential jurors of the petitioner's full name so that the venire could determine if they heard any publicity regarding this individual (trial transcript Vol. 1, p. 53), as well as the names of all potential witnesses in the case (trial transcript Vol. 1, pp. 53 and 54), and when it came to the questioning of the one juror that had read some information about this case, the inquiry was done at the bench and outside the hearing of the other members of the jury venire (trial transcript Vol. 1, p. 57, Lns. 23

23

and 24). There was no possible taint on the venire from these questions to juror 32.

The petitioner fails to meet even the basic elements for possible reversible due to pre-trial publicity as outlined in Chagra, supra, in that, no pre-trial publicity was known by the jurors hearing this case to create potential prejudice and the District Court and counsel conducted extensive voir dire with the one and only potential juror hearing news on this issue, while permitting both government counsel and defense counsel to supplement the Court's questions with individual, attorney-directed voir dire. Although the petitioner attached extensive news articles about this defendant and his violent crimes, there is no showing that any other member of the venire read these articles, heard of them, or otherwise was familiar with any publicity connected with this case. Because juror 32 never served on this case as a selected juror his knowledge of the publicity played no role in this case.

There is no merit to Petitioner's grounds three and four that he was subject to unfair pre-trial publicity in this case and that his trial counsel failed to properly conduct individual voir dire of members of the venire on this pre-trial publicity issues.

**VI.   Defense Counsel Was Not Ineffective By Not Challenging The Admission Of The Firearm Into Evidence At Trial  (Ground Five)**:

Joseph claims that he was subject to ineffective assistance of stand-by counsel and appellate counsel for their alleged failure to challenge the oral admission leading to the seizure of Joseph's firearm and the admission of the firearm itself.  Joseph claims that these alleged deficiencies violate his Fifth and Sixth Constitutional Amendment rights, and

24

that the gun and the oral admissions should not have been admitted pursuant to Rule 403 of the Federal Rules of Criminal Procedure.

Factually, the oral admission and the seizure of the weapon occurred in the following manner. Joseph was apprehended February 15, 2001, at a New Orleans hotel. Id. at 375-76, 381-84. After Joseph said a weapon was present in the room, authorities located a .9 millimeter semiautomatic handgun on the bed. Id. at 382-84. This gun was admitted as government exhibit 63.

This Court reviews a district court's denial of a motion to suppress by:

(1) viewing the facts in the light most favorable to the prevailing party,

(2) accepting the district court's factual findings unless clearly erroneous, and

(3) considering all questions of law de novo. United States v. Lampazianie, 251 F.3d 519, 523 (5th Cir. 2001).

In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court recognized a public safety exception to the requirement of Miranda warnings before a defendant's answers are admissible in evidence. Id. at 655-56. In Quarles, police had subdued, frisked and handcuffed a defendant before asking him the whereabouts of a gun they believed he possessed. Id. at 651-52. Without the benefit of Miranda warnings, he replied, "the gun is over there." Id. at 652. Finding suppression unwarranted, the Supreme Court observed that "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." Id. at 657.

In this case, the FBI agent who questioned Joseph about the gun testified he had

been informed during the pre-arrest operational briefing that "Mr. Joseph was here to do

a bank robbery and did have a weapon." 2 2nd Supp. R.A. 7. As in Quarles, Joseph was

handcuffed at the time of the gun inquiry. Id. at 9. As in Quarles, serious public safety

issues remained. The FBI agent was concerned about "the safety of everyone involved"

and whether accomplices were present in the hotel room, as the room had not been

secured. Id. at 9-13. Agents also needed to locate any weapons to prevent them from

falling into the wrong hands, including those of hotel employees and others. See Quarles,

467 U.S. at 657; see also Fleming v. Collins, 954 F.2d 1109, 1112 (5th Cir. 1992) (en

banc). Because the FBI agent "was trying to establish the safety of the room and to make

a complete determination as to whether or not anybody else was in the room," the district

court did not err in concluding that the admission fell squarely within the public safety

exception to Miranda. See 2 2nd Supp. R.A. at 14; Quarles, 467 U.S. at 657-58. Because

the District Court clearly found that the oral admission leading to the seizure of the firearm

was squarely based on a legitimate public safety concern and considering Quarles, supra,

there is no basis for the defendant to claim that his U.S. Constitutional rights were violated,

and there is no merit to his allegation that this probative evidence should not have been

admitted pursuant to Rule 403 of the Federal Rules of Criminal Procedure. Exhibit 63 was

a fruit of the charged crimes, was seized from the defendant following his arrest, and was

properly utilized by expert ATF Special Agent Michael Eberhardt during his trial testimony

establishing that this firearm met the statutory definition of a firearm, traveled in interstate

26

commerce, and exhibited the same firearms characteristics as firearms used by the defendant and captured on bank surveillance cameras.

Moreover, even assuming any error occurred in the admission of Joseph's statement, the error was harmless in light of the overwhelming evidence of guilt, including the surveillance photographs and other evidence of Joseph's possession and use of a firearm. See 6 2nd Supp. R.A. 473-87; Statement of Facts, supra, United States v. Barrington, 806 F.2d 529, 532-33 (5th Cir. 1986).

## VII. Defense Counsel Was Not Ineffective In Opposing Government's Notice Of Intent To Use Other Crimes To Establish Motive, Intent and Plan, Pursuant To Federal Rules Of Evidence, Rule 404(b) (Ground Six):

Joseph argues that he suffered ineffective assistance of appellate counsel for counsel's failure to raise on direct appeal petitioner's motion in opposition to the government's notice of intent to use other crimes evidence pursuant to Rule 404(b) of the Federal Rules of Evidence and that he suffered a violation of his Constitutional Fifth and Sixth Amendment rights as a result.

This issue was well briefed by both government counsel and defense counsel at the time of trial and carefully considered and acted upon by the trial court. Pursuant to Rule 404(b) of the Federal Rules of Evidence, the government filed a timely notice of intent to use other crimes during the prosecution's case in chief in order to establish plan, motive, opportunity and intent on the part of the defendant in the commission of his charged offenses. See Record, Vol. 1, pp. 222-233.

27

Specifically, the government provided notice that it intended to offer proof that on February 2, 2002, shortly after the defendant committed the bank robbery of Liberty Bank, New Orleans, Louisiana, (which formed the basis of Count 4) a Louisiana State Trooper attempted to stop the defendant for a traffic violation. The government stated that this trooper observed the defendant raise a weapon toward the trooper and then sped away. The government provided notice that it intended to show that a vehicular chase ensued on an interstate highway and that the defendant fired several gun shots in the direction of the trooper. Additionally, the government provided notice that it intended to show that after the defendant shot in the direction of the trooper, the defendant then pointed a firearm at an individual who was sitting in her vehicle on the Interstate and that the defendant forced this individual out of her vehicle and pushed her onto the highway. Finally, the government advised in its notice filing that it intended to show that the defendant departed the area while driving the stolen car from the victim.

In its filing, the government asserted two bases for the introduction of this Rule 404(b) evidence. First, that the acts were intrinsic to the charged offense involving the Liberty Bank robbery and the carjacking of Rhonda Jackson. Second, that the evidence was admissible under Rule 404(b) of the Federal Rules of Evidence in that it proved, among other things, motive, knowledge, opportunity, preparation, plan or absence of mistake or accident.

The government in its filing relied on the intrinsic evidence theory of introduction by stating evidence is intrinsic to the crime charged "if the other act and evidence of the crime

28

charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." United States v. Costa, 691 F.2d 1358, 1360-1361 (11th Cir. 1982). If so, the evidence is admissible "to complete the story of the crime by proving the immediate context of events in time and place." Id. Evidence of an uncharged offense arising out of the same transaction as the offense charged is intrinsic evidence. United States v. Asibor, 109 F.3d 1023, 1033 (5th Cir.) cert. denied, 118 S.Ct. 638 (1997). (Emphasis added) Intrinsic evidence does not implicate Rule 404(b), so "consideration of its admissibility pursuant to Rule 404(b) is unnecessary.'" Coleman, 78 F.3d at 156 (citation omitted); see Asibor, 109 F.3d at 1033.

As an alternative to admitting this evidence as intrinsic, the government also argued that it may be admitted as evidence pursuant to Rule 404(b) under the Federal Rules of Evidence. Specifically, the government asserted that Rule 402, Federal Rules of Evidence provides that all relevant evidence is admissible except as otherwise provided. Rule 404(b) of the Federal Rules of Evidence makes evidence of "crimes, wrongs, or acts" extrinsic to the indictment inadmissible to prove the character of the defendant, but allows the extrinsic acts may be admissible to prove, among other things, motive, knowledge, opportunity, preparation, plan, or absence of mistake or accident.

The government further argued that the Fifth Circuit in United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920 (1979) set forth a two-pronged test by which the admissibility of evidence of extrinsic offenses and acts will be governed. Under Beechum, the trial court must determine (1) that the extrinsic evidence

29

is relevant to an issue other than the defendant's character and (2) that the incremental probative value of the extrinsic offense evidence is not substantially outweighed by the danger of unfair prejudice of the defendant. Furthermore, the principles governing extrinsic evidence are the same, whether the offense occurs before or after the offense charged. United States v. Beechum, 582 F.2d at 903.

The defendant filed an objection to the government's notice of intent to use Rule 404(b) and/or intrinsic evidence and filed an opposition arguing that the defendant was not involved in some of the offense the government sought to introduce and/or the offenses were not connected to the charged bank robbery. See Record, Vol. 1, pp. 201-203.

The Court carefully considered the government's notice and the defense opposition and ruled that the alleged car chase and gunfire were intrinsic to the charged crimes in the superseding indictment and denied Joseph's motion to exclude pursuant to Rule 404(b) of the Federal Rules of Evidence. See Record Vol. 1, pp. 139-143.

Specifically, the Court found that the Fifth Circuit had affirmed admission of intrinsic evidence of uncharged offenses arising out of the same transactions as the offenses charged in an indictment. The trial court relied on United States v. Maceo, 947 F.2d 1191, 1199 (5th Cir. 1991), in which the defendants were charged with participating in a drug conspiracy. One of the defendants was an attorney who allegedly accepted cocaine from drug traffickers in return for services rendered in connection with the conspiracy. Id. at 1198. Although this arrangement was not charged as an offense, the Fifth Circuit found that evidence of these "other acts" was "part and parcel of the conspiracy itself," was

30

inextricably intertwined with the evidence used to prove the crime charged," and was "admissible so that the jury may evaluate all of the circumstanced under which the defendant acted." United States v. Ridlehuber, 11 F.3d 516, 521 (5th Cir. 1992) (citing Maceo and quoting United States v. Randall, 887 F.2d 1262, 1264 (5th Cir. 1989).

In the case at bar, the trial Court found that the alleged bank robbery, car chase, shoot-out and carjacking were all parts of a "single criminal episode." United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982). The Court did not agree with the defendant's argument that the car chase and the gunfire were only related to the speeding violation. The Government charged that Joseph robbed a bank, fled the scene, led a state trooper in a car chase on the interstate, wrecked his car, fired on the trooper, and carjacked Rhonda Jackson to make his escape. The Court found that all of these alleged actions were inextricably intertwined, and found the evidence of the non-charged offenses ". . . admissible to complete the story of the crime by proving the immediate context of events in time and place." Coleman, 78 F.3d at 156. Like the Maceo court, the Court found that the car chase and the shoot-out were "part and parcel" of the robbery, escape and carjacking and that evidence of these alleged actions were "admissible so that the jury may evaluate all of the circumstances under which the defendant acted." Ridlehuber, 11 F.3d at 521. Accordingly, the trial Court properly ruled that evidence of the car chase and the gunfire was admissible as evidence of intrinsic acts.

The trial court thoroughly considered the admissibility of the evidence addressed above and Joseph's able counsel filed a well-reasoned and carefully-considered objection

31

advancing the best arguments possible for exclusion of this evidence. There clearly was no deficiency on the part of Joseph's trial counsel in raising this issue and the Court issued a well-reasoned, written ruling stating the reasons for the evidence admission and the case law supporting such admission. Because this issue was so thoroughly briefed at the trial level and resolved after considering all facts and applicable law, it was eminently reasonable for appellate counsel to conclude that there was no merit in appealing this trial court ruling and that the trial court had a sound basis for the admission of this intrinsic evidence. Joseph's argument that he was deprived of effective appellate counsel in this area is without merit.

## VIII. Defense Counsel Was Not Ineffective In Not Moving To Suppress Witness Statements (Ground Seven):

Joseph asserts that he was subject to ineffective assistance of counsel because counsel did not move to suppress the testimony of virtually all of the government's witnesses presented in the government's case-in-chief on the grounds that these witnesses' testimony allegedly conflicted with other evidence in the case. Specifically, Joseph expressed concern that the description of the perpetrator recorded by these witnesses did not exactly match the description of Joseph himself.

At trial, numerous witnesses identified Joseph as the robber and provided details of the three robberies through bank surveillance photographs. 4 2nd Supp. R.A. 120-29, 144-53, 215-22, 240-50; 5 2nd Supp. R.A. 343-50, 362-66. A long-time acquaintance reviewed the surveillance photographs and identified Joseph as the robber. 4 2nd Supp.

32

R.A. 186-91. The driver of the carjacked Accord identified Joseph as the carjacker. 5 2nd Supp. R.A. 315-16, 322-27. Joseph was wearing a black jacket and yellow boots during the final bank robbery and at the time of his arrest. 5 2nd Supp. R.A. 361, 365, 370-72.

Joseph was apprehended February 15, 2001, at a New Orleans hotel. Id. at 375-76, 381-84. After Joseph said a weapon was present in the room, authorities located a .9 millimeter semiautomatic handgun on the bed. Id. at 382-84.

Joseph cites no basis establishing the inadmissibility of the government's witnesses he objects to and his own exhibits demonstrate the full extent to which the government provided the petitioner with all relevant discovery related to this case and, in particular, the identifying characteristics of the perpetrator.

Therefore, the petitioner's assertion that the evidence was conflicting or contradictory in itself does not serve as a basis to exclude the many witnesses whom the government called to establish the identity of the defendant as well as his criminal conduct.

## IX. Appellate Defense Counsel Was Not Ineffective In Challenging The Sentencing Of The Defendant And His Election To Waive Counsel (Ground Eight):

A defendant "has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." Dunn, 162 F.3d at 307. A defendant who wishes to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with his eyes open." Id. (quoting Faretta v. California, 422 U.S. 806, 835 (1975)) (internal quotation omitted).

In determining the validity of a defendant's waiver of counsel, relevant considerations include a defendant's age, education, background, experience and conduct; the waiver must not be the result of coercion or mistreatment of the defendant; and the defendant must understand the nature of the charges, the consequences of the proceedings and the practical meaning of the right he is waiving. McQueen v. Blackburn, 755 F.2d 1174, 1177 (5th Cir. 1985). The failure of the district court to conduct an on-record, comprehensive inquiry regarding waiver of counsel does not require reversal if the surrounding facts and circumstances indicate that the defendant understood his right to counsel and the difficulties of pro se representation. Neal v. Texas, 870 F.2d 312, 315 & n.3 (5th Cir. 1989).

Faced with an obstreperous defendant's rejection of his second court-appointed counsel on the morning of his second continued trial date, the district court properly viewed the rejection as a waiver of Joseph's right to counsel and questioned Joseph outside the presence of the jury as to whether he wished to represent himself. See 4 2nd Supp. R.A. 5-17; McQueen, 755 F.2d at 1178 (defendant's discharge of counsel after court cautioned that no replacement counsel would be appointed constituted valid waiver); United States v. Gallop, 838 F.2d 105, 109-11 (4th Cir. 1988).

During the waiver inquiry, Joseph was informed of his right to counsel and warned against self-representation. 4 2nd Supp. R.A. 7-8, 10. The district court advised Joseph that it was not in his best interest to represent himself and that his court-appointed counsel was "exceptionally conscientious" and well-prepared for trial. Id. at 7-8, 10, 15-16. During

34

the guilt phase of the trial, the district court strongly recommended that Joseph allow court-appointed counsel to cross-examine witnesses and propound evidence.  Id. at 10.  In addition, Joseph was admonished that he would be expected to follow the district court's rules and the Federal Rules of Criminal Procedure, to question witnesses only about relevant matters, to respect the judicial proceedings and not to ramble or otherwise be disruptive.  Id. at 9-10; see Dunn, 162 F.3d at 307.

Joseph was explained the maximum penalties at his arraignment, R.A. 240, and fully understood the nature of the charges against him and the penalties he faced.  See 4 2nd Supp. R.A. 15.  After the district court urged, "[a]gain, I am discouraging you from representing yourself," Joseph responded, "George Chaney ain't on trial for his life, no 175 years,[8] 13 charges in a federal court system,[9] about what – four, five more in the parish. . . He ain't on trial for his life.  I'm on trial for my life."  4 2nd Supp. R.A. 15; see McQueen, 755 F.2d at 1177-78.

Although Joseph professed never having engaged in gainful employment and his education level is unknown,[10] these facts are not dispositive.  See McQueen, 755 F.2d at 1177-78 (waiver valid though defendant had only an eighth-grade education).  By the time

---

[8]    Joseph faced more than 150 years imprisonment on the federal charges alone.  See Presentence Investigation Report at 1-2.

[9]    Joseph correctly understood that he was on trial on a 13-count indictment.  See R.A. 244-50.

[10]   At the competency hearing, a pretrial services officer testified that for purposes of his financial affidavit for court-appointed counsel, Joseph had stated that he had never worked.  3 2nd Supp. R.A. 51. The Presentence Investigation Report states that Joseph was 27 as of sentencing and that his education is unknown.  Presentence Investigation Report at 2.

of his trial, Joseph already had experienced a decade-long involvement with the criminal justice system.[11] At the waiver hearing, Joseph exhibited an understanding of trial processes, demanding assorted discovery for trial preparation purposes, including surveillance evidence, a fingerprint analysis, "the Giglio material" and "the Jencks material." 4 2nd Supp. R.A. 4-5, 16. Further, the district court found that after a day of representing himself, Joseph "understood everything" and "did a very competent job." 6 2nd Supp. R.A. 457.

Asserting that "there is a difference between being competent to proceed and understanding the ramifications of representing one's self at trial," Joseph contends he was not competent to waive counsel. J.Br. 15. In fact, the Supreme Court has held that the level of competence required to waive counsel is the same as that required to stand trial. Godinez v. Moran, 509 U.S. 389, 399-400 (1993); see Dunn, 162 F.3d at 308. As set forth above, Joseph was competent to stand trial. It necessarily follows that he also was competent to waive his right to counsel. See Dunn, 162 F.3d at 308.

Joseph further contends that he should not have been allowed to waive counsel because, in hindsight, his efforts at self-representation were in stark contrast to those of defense counsel and failed to further his defense. As the Supreme Court has recognized, however, a defendant's "technical legal knowledge" is "not relevant" to determining whether

---

[11] The Presentence Investigation Report states that Joseph had convictions for possession with intent to distribute crack cocaine, for which he received probation, which was twice revoked, and possession of crack cocaine, for which he received a 30-month sentence. Presentence Investigation Report at 13-14, ¶¶ 85-89. He also had a lengthy arrest record dating back to 1990. Id. at16-17, ¶¶ 101-10.

he is competent to waive his right to counsel. Godinez, 509 U.S. at 400 (internal quotation omitted). Although a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." Id. (internal quotation omitted). Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts, a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation." Id. (citation and internal quotation omitted).

Further, even if the district court committed any error in its waiver determination, this Court has analyzed waiver of counsel for harmless error, although harmless error analysis has been rejected in certain other Sixth Amendment contexts.[12] Joseph can establish no prejudice from his self-representation during the guilt phase of the trial in light of the overwhelming evidence of his guilt. See 4-6 2nd Supp. R.A. Accordingly, reversal is unwarranted.

At the sentencing hearing and contrary to Joseph's assertions, the defendant was represented by able defense counsel. See Sentencing Hearing Transcript (Vol. No. blacked out, pp. 2-35). At the sentencing hearing, the defendant never waived counsel, but together Joseph and his counsel presented objections, arguments on objections and filed motions. Joseph was obstreperous during this sentencing hearing and raised many

---

[12]    Compare Richardson v. Lucas, 741 F.2d 753, 757 (5th Cir. 1984) (assuming waiver of counsel was constitutionally invalid, error was harmless because representation would not have affected outcome of trial), with McKaskle v. Wiggins, 465 U.S. 168, 177 (1984) (holding denial of self-representation not subject to harmless error analysis); United States v. Pollani, 146 F.3d 269, 274 (5th Cir. 1998) (denial of last-minute request to be represented by new counsel, who was present and ready to proceed, warranted reversal regardless of prejudice).

spontaneous oral objections while the sentencing Court patiently reviewed each of these last minute oral objections. Throughout the entire sentencing hearing, the defense counsel was present and actively represented the defendant. There is no fact showing that the petitioner waived counsel at the sentencing hearing or that defense counsel was deficient in any manner.

## X.  Appellate Defense Counsel Was Not Ineffective In Considering Potential Apprendi Issues On Appeal (Ground Nine):

Joseph argues that he suffered ineffective assistance of appellate counsel because his counsel did not raise issues the petitioner believes were relevant to his sentencing pursuant to Apprendi v. New Jersey, 530 U.S. 466, 49 (2000) and Blakely v. Washington, 121 S. Ct. 2531 (2004),

Joseph's sentence under the United States Sentencing Guidelines was calculated as follows:

With an offense level of 30 and a criminal history category of IV, Joseph's applicable sentencing range was 135-168 months for the bank robbery counts (Counts 1, 4 and 8) and the carjacking count (Count 7).[13] The government sought an upward departure of 20 years from the guidelines range. R.A. 42-44. At the sentencing hearing, the district court granted the motion but denied the 20-year departure, instead departing upward two levels to criminal history category VI, resulting in a range of 168-210 months. 3 Supp. R.A. 31-

---

[13]     The felon-in-possession-of-a-firearm counts (Counts 3, 6, 10 and 12) were capped at the statutory maximum of 120 months, and the brandishing-a-firearm-during-the-commission-of-a- crime-of-violence counts (Counts 2, 5 and 9) carried mandatory, consecutive seven-year sentences. See Presentence Investigation Report at 18, ¶ 112.

33; R.A. 20. The district court sentenced Joseph at the top of the range, resulting in a 42-month increase in sentence due to the departure on a total sentence of 462 months. 3 Supp. R.A. 32-33.[14] Joseph was ordered to make restitution to the three robbed banks and was placed on supervised release for a term of five years following imprisonment. R.A. 20.

In Blakely v. Washington, 2004 WL 1402697 (June 24, 2004), the Supreme Court applied the rule of Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), to invalidate a sentencing enhancement, imposed pursuant to state law, that increased the sentence beyond the range authorized by Washington state's statutory sentencing guidelines regime. The Court explained that, because the facts supporting the enhancement were "neither admitted by [the defendant] nor found by a jury," the sentence violated the Sixth Amendment right to trial by jury. 2004 WL 1402697, at *4.

Blakely did not invalidate the federal sentencing Guidelines, nor did it hold that its rule applies to the Guidelines. See 2004 WL 142697, at *6 n.9 ("[t]he Federal Guidelines are not before us, and we express no opinion on them"); see also Apprendi, 530 U.S. at 497 n. 21 (same). Indeed, in Apprendi itself, the Court expressed no view on the Guidelines beyond "what this Court has already held." Ibid. (citing Edwards v. United States, 523 U.S. 511, 515 (1998)).

What the Court has "already held" about the Guidelines therefore continues to provide the governing principle for this court – and Supreme Court rulings have consistently

---

[14]     Joseph received imprisonment for 210 months as to each of Counts 1, 4 and 8; 180 months as to Count 7; 120 months as to Counts 3, 6, 10 and 12, all terms to run concurrently; and a term of 84 months as to each of Counts 2, 5 and 9 to run consecutively to each and all other counts. R.A. 20, 27; 3 Supp. R.A. 32.

upheld the Guidelines against constitutional attack and underscored their unique status within our constitutional scheme. See, e.g., Mistretta v. United States, 488 U.S. 361 (1989). Indeed, the Court has found that so long as a sentence does not exceed the statutory maximums established by Congress for the offense of conviction, a Guidelines sentence can (in fact, sometimes must) be based on judge-found conduct not proved to a jury, see Edwards v. United States, 523 U.S. 511, 514-15 (1998); conduct not charged in the indictment, see Witte v. United States, 515 U.S. 389, 399-401 (1995); and conduct of which a defendant is acquitted but is established by a preponderance of the evidence. See United States v. Watts, 519 U.S. 148, 156-57 (1997) (per curium). Moreover, the Court has explicitly held that courts are bound not only by the Guidelines, but by their policy statements and commentary as well. Stinson v. United States, 508 U.S. 36, 42 (1993).

This court is required to follow these precedents. See State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) ("it is [the Supreme Court's] prerogative alone to overrule one of its precedents"); Agostini v. Felton, 521 U.S. 203, 237 (1997) (courts of appeals must leave to "this Court the prerogative of overruling its own decisions," even if such a decision "appears to rest on reasons rejected in some other line of decisions") (quotations, citations omitted). Indeed, every court of appeals recognizes that it is obliged to follow Supreme Court precedent, even when that precedent may appear to be undermined by subsequent Supreme Court decisions.[15]

---

[15]    United States v. Rodriguez-Montelongo, 263 F.3d 429, 434 (5th Cir. 2001) ("It is for this court to apply the law as it exists and for the Supreme Court to overrule its precedent if it so chooses.")

Furthermore, the courts of appeals have also unanimously held that the federal Guidelines do not violate the rule of Apprendi.[16] These decisions, too, bind the district courts and the individual panels of the courts of appeals.[17]     This court, thus, may not take it upon itself to cast aside the Guidelines system and the integrated sentencing process it mandates.

The Sentencing Reform Act of 1984 significantly altered the way in which district courts sentence persons convicted of federal crimes. Before the Act, Congress defined broad sentencing ranges, and then left it to individual judges to set sentences within those ranges on a case-by-case basis. See Mistretta, 488 U.S. at 364 (pre-Guidelines, "Congress delegated almost unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range"). With the Act, Congress delegated the authority to channel that judicial discretion to the Sentencing Commission, an "independent commission in the judicial branch of the United States." 28 U.S.C. 991(a); see Mistretta, 488 U.S. at 385. Congress charged the Commission with devising a system of sentencing ranges for categories of offenses and defendants according to various specified and unspecified factors. See 28 U.S.C. 994(a)-(e).[18]   In response, the Commission chose to create a system requiring a court to consider a defendant's "real"

---

[16]     United States v. Floyd, 343 F.3d 363, 372 (5th Cir. 2003).

[17]     Shell Offshore, Inc. v. Director, Dep't of Labor Office of Workers' Compensation Programs, 122 F.3d 312, 316 (5th Cir. 1997).

[18]     See also 28 U.S.C. 991(b)(1)(B) (Commission directed to establish sentencing policies that "provide certainty and fairness in meeting the purposes of sentencing" and that "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct" while maintaining "sufficient flexibility to permit individualized sentences").

offense (i.e., his actual conduct), even if that conduct is not part of the charged offense of conviction. See Guidelines Manual Ch. 1, Pt. A, intro. comment. 4(a) (2002) (now included as an editorial note following Guidelines § 1A1.1). The Commission also specified that such guidelines determinations were to be made within the statutory maximums established by Congress in the U.S. Code. See Guidelines § 5G1.1; see also Witte, 515 U.S. at 401-02 (noting that Guidelines channel the discretion of sentencing courts to take into account related uncharged misconduct in imposing sentence up to the statutory maximums, in a manner comparable to pre-Guidelines practice).

In Mistretta, 488 U.S. at 412, the Supreme Court upheld the constitutionality of both the federal Guidelines and the Sentencing Commission. In the face of nondelegation and separation of powers challenges, it held that "Congress neither delegated excessive legislative power [to the Commission] nor upset the constitutionally mandated balance of powers among the coordinate Branches" by placing the Commission within the judicial branch. Id. at 384-85, 412; see also id. at 412 (Constitution does not prohibit Congress "from calling upon the accumulated wisdom and experience of the Judicial Branch in creating policy on a matter uniquely within the ken of judges").[19]

With the overall constitutionality of the Guidelines established, the Court was then called upon to evaluate various of the Guidelines' real world applications. Repeatedly, it

---

[19]     The courts of appeals have widely held that the Guidelines also comport with due process. See, e.g., United States v. Govan, 152 F.3d 1088, 1094 (9th Cir. 1998); United States v. Piper, 35 F.3d 611, 620 (1st Cir. 1994); United States v. Spencer, 25 F.3d 1105, 1112 (D.C. Cir. 1994); United States v. Kerr, 13 F.3d 203, 207 (7th Cir. 1993); United States v. Guajardo, 950 F.2d 203, 206 (5th Cir. 1991); United States v. Delibac, 925 F.2d 610, 614-15 (2d Cir. 1991).

42

upheld Guidelines sentences based on judge-found facts neither submitted to nor considered by a jury. Indeed, in Watts, 519 U.S. at 153-54, the Court upheld an enhancement, under Guidelines § 2D1.1(b)(1), for possession of a gun in connection with a drug offense, even though the jury had acquitted the defendant of the firearms charge under 18 U.S.C. 924(c). The Court noted that Guidelines § 1B1.3 — the "relevant conduct" rule – "directs sentencing courts to consider all other related conduct, whether or not it resulted in a conviction." 519 U.S. at 153-54; see also Guidelines § 1B1.3, comment., backg'd ("conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range"). Applying that principle, the Court held that the sentencing court could consider the defendant's acquitted conduct (the firearms use) in determining his Guidelines sentencing range (for drug trafficking), so long as the acquitted conduct was proved by a preponderance of the evidence. 519 U.S. at 156-57; see id. at 154 ("sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction").

Other cases, too, have upheld Guidelines sentences based on related criminal conduct proved to a judge at sentencing, and not underlying a jury's verdict of guilt. See Witte, 515 U.S. at 399-400 (judge may impose higher Guidelines sentence on defendant convicted of possessing marijuana based on judge's finding that offender also engaged in uncharged cocaine conspiracy); Edwards, 523 U.S. at 514-15 (even if jury convicted defendant of cocaine-only conspiracy, judge may impose higher Guidelines sentence

43

based on finding that defendant's conduct included crack-related activities); United States v. Dunnigan, 507 U.S. 87, 95-96 (1993) (court may impose Guidelines enhancement for perjury at trial when sentencing defendant for offense of conviction).

In so ruling, the Court clearly viewed the Guidelines enhancements not as "statutory maximums" (requiring proof to a jury beyond a reasonable doubt), but as rules channeling the discretion of judges within the congressionally set maximums in the U.S. Code. Indeed, the Court explicitly said as much in Edwards, which it notably cited with approval in Apprendi:

> Of course, petitioners' statutory and constitutional claims [that the court must base its Guidelines sentence exclusively on the cocaine-only facts found by the jury] would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy. That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines.

Edwards, 523 U.S. at 515; Apprendi, 530 U.S. at 497 n.21; see also Witte, 515 U.S. at 399-400 (although Guidelines enhancement for uncharged conduct resulted in higher Guidelines range than otherwise would have applied, range "still falls within the scope of the legislatively authorized penalty" and is thus constitutionally permissible); Mistretta, 488 U.S. at 396 (Guidelines "do not . . . establish minimum and maximum penalties" for crimes).

The Court has thus analyzed the Guidelines as channeling judicial discretion within congressionally set statutory maximums, not as creating lower statutory maximums for the offenses defined by Congress. To upset that understanding now — and either invalidate the Guidelines altogether, or hold that every of the myriad Guidelines adjustments,

44

enhancements and upward departures must be proved to a jury beyond a reasonable doubt — would wreak havoc on the federal criminal justice system. In 2002 (the most recent year for which statistics are available), 64,366 federal defendants were sentenced under the Guidelines. 2002 Source Book of Federal Sentencing Statistics. At this moment, thousands of cases (at every stage of the proceedings, from indictment, plea negotiation, trial, sentencing and appeal) would be affected by such a ruling.

Even beyond principles of *stare decisis*, this court should not place the system in such jeopardy and turn back the clock on years of sentencing reform – especially where, as discussed below, this outcome is not mandated by Blakely.

Blakely involved two Washington state statutes, one broad and one specific, that set forth various maximum penalties for criminal offenses. The first prescribes maximum sentences depending on whether a crime is a Class A felony (life maximum), Class B (ten years), or Class C (five years). Wash. Rev. Code § 9A.20.021(1). The second statute categorizes individual crimes by "seriousness level" which, along with an offender's criminal history score, yields a "presumptive sentencing range," which is set forth in the state code in the form of a sentencing grid. See Wash. Rev. Code § 9.94A.310(1) (Table 1) (now revised and codified at Wash. Rev. Code § 9.94A.510). The statute authorizes a court to impose a sentence above the presumptive range if it finds "substantial and compelling reasons justifying an exceptional sentence." Blakely, 2002 WL 1402697, at * 2. The statute includes an illustrative, non-exhaustive list of possible aggravating factors justifying an exceptional sentence. 2004 WL 1402697, at * 2.

45

Blakely pleaded guilty to second-degree kidnapping involving domestic violence and use of a firearm, a Class B felony. The sentencing court did not sentence him to the presumptive range set by the statutory guidelines (49-53 months) for his crime, but imposed an "exceptional sentence" of 90 months based upon its finding that Blakely had acted with "deliberate cruelty" in committing the offense. 2004 WL 1402697, at * 3-4. Applying the rule of Apprendi — that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490 — the Court held that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 2004 WL 1402697, at * 4. Because "deliberate cruelty" was neither proved to a jury nor admitted by Blakely in his plea, the Court ruled that the enhanced sentence was unconstitutional. Id. at * 4, 6.

As in Apprendi, the legislative scheme in Blakely created two distinct statutory maximums. In Blakely, one very broadly classified (and provided broad maximum ranges for) offenses as A, B, or C felonies, and the other provided crime-by-crime guidelines ranges, from which a judge could depart upward based on his or her own findings of aggravating factors. See 2004 WL 1402697, at * 2.

That is not how the federal system operates. Congress has only created one set of statutory maximums for federal crimes. The Guidelines operate within those maximums, see Guidelines § 5G1.1, and set forth a host of factors (the current Manual runs some 491

46

pages) that courts are to consider, both in aggravation and mitigation, in individualizing a particular sentence. These factors correspond to those that judges have always taken into account — such as the manner in which a crime was committed, the nature of the victim, the defendant's role in the offense, whether he obstructed justice at trial, and whether he accepted responsibility for his actions -- in fashioning sentences. Watts, 519 U.S. at 152.[20] As discussed above and as the Supreme Court has indicated, the federal Guidelines were never intended to operate on the same footing as the statutory maximums. Indeed, that very assumption sits at the heart of the Guidelines: "they do not bind or regulate the primary conduct of the public or . . . establish[] minimum and maximum penalties for every crime. They do no more than fetter the discretion of sentencing judges to do what they have done for generations — impose sentences within the broad limits established by Congress." Mistretta, 488 U.S. at 396.

Further, as Mistretta made clear, the Guidelines and the Sentencing Commission that promulgates them are constitutionally unique. The Commission is not a legislative body but an "independent commission in the judicial branch of the United States." 28 U.S.C. 991(a). The federal Guidelines are not statutes but sentencing rules — binding on sentencing courts by statute, see Mistretta, 488 U.S. at 367; Stinson, 508 U.S. at 42 (citing 18 U.S.C. § 3553(b)) — but nevertheless the unique product of a special and limited delegation of authority.

---

[20]    Indeed, in formulating the Guidelines, the Commission canvassed prior sentencing practice and attempted to identify and to assign weights to all the factors that judges traditionally used in determining appropriate sentences. See United States Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 16-17 (1987).

Mistretta recognized that the substance of Congress' delegation to the Commission was essentially nonlegislative in character. Like Congress' delegation of rulemaking authority to the judicial branch to prescribe rules of procedure and evidence, see, e.g., 28 U.S.C. 2072, the delegation to the Commission to make sentencing rules "simply leaves with the Judiciary what long has belonged to it." 488 U.S. at 396. Or, put another way:

> Prior to the [Sentencing Reform] Act, the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the everyday business of judges . . . to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them. The Sentencing Commission does no more than this, albeit basically through the methodology of sentencing guidelines, rather than entirely individualized sentencing determinations.

488 U.S. at 395; id. at 391 ("Commission's functions . . . are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch"); see also United States v. Kinter, 235 F.3d 192, 201 (4th Cir. 2000) ("the Commission's act of establishing sentencing ranges in the Guidelines is categorically different from the legislative act of setting a maximum penalty in a substantive criminal statute").

Blakely, of course, did not rest on the fact that the Washington guidelines scheme was legislatively enacted. Nor, however, did it say that the source of the "statutory maximum" (whether congressional statute or commission guideline) for Apprendi purposes is immaterial. Imposing Apprendi's requirements only when the legislature has made a defendant's exposure to increased punishment contingent on findings of fact that the legislature itself specifies vindicates Apprendi's animating constitutional values. The Sixth Amendment right to trial by jury, and the due process right to insist on rigorous proof to

establish guilt of an offense, are fully protected when there must be a jury finding beyond a reasonable doubt on the facts that establish the legislatively prescribed maximum punishment to which a defendant is exposed. Democratically-enacted statutes provide one of the most basic contracts between a citizen and his or her government. Far more than the intricate, extensive, and many-layered determinations in the Guidelines manual, which are the products of the Commission's "significant discretion in formulating guidelines," Mistretta, 488 U.S. at 657, the U.S. Code tells the people of the United States what is and is not expected of them, and warns them of the ultimate consequences should they refuse to follow the rules. As Justice Scalia said in Apprendi:

> I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years — and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge. . . Will there be disparities? Of course. But the criminal will never get more punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.

530 U.S. at 498 (Scalia, J., concurring) (emphasis in original); see also Harris v. United States, 536 U.S. 545, 562 (2002) ("[s]ince sentencing ranges came into use, defendants have not been able to predict from the face of the indictment precisely what their sentence will be; the charged facts have simply made them aware of the 'heaviest punishment' they face if convicted. Judges, in turn, have always considered uncharged 'aggravating circumstances' that, while increasing the defendant's punishment, have not swelled the penalty above what the law has provided for the acts charged.") (plurality opinion) (citations, internal quotation marks omitted).

49

In sum, the Supreme Court decisions before Blakely uniformly upheld the Guidelines system as written: a tightly integrated system of sentencing rules written for judges to apply based on their findings of fact.  Blakely explicitly declined to express a view on the Federal Sentencing Guidelines.  This court accordingly should continue to adhere to the law as it stands and the sentence of Joseph should remain undisturbed because it is not impacted by Blakely or Apprendi.

Finally, the petitioner can find no support in Blakely or Blakely in concert with Apprendi in light of the recent controlling Fifth Circuit decision in United States v. Pineiro, 377 F.3d 464 (5th Cir. 2004).  Pineiro has found in this Circuit that the Washington State Court ruling in Blakely has no application to the Federal Sentencing Guidelines.  Moreover, the only departure applied to the guidelines, beyond what was found by the jury in this case, resulted from and upward departure of two levels as a result of the defendant's significant criminal activity not reflected in the guideline computation.  See 3 Supp. R.A. 31-33; R.A. 20.

## XI.    There Are No Cummulative Errors Justifying Reversal Of The Conviction Or Sentence  (Ground Ten):

Joseph asserts that grounds one through nine allege errors warranting reversal of his convictions and/or resentencing.  As detailed above, the government avers that none of the grounds listed by the petitioner establish any error at all in the proceedings or the petitioner's counsel representation and that no relief of any kind is warranted in this case.

50

Petitioner asserts that his alleged errors were the result of ineffective representation, either at the trial level and/or the appellate level. To warrant reversal for ineffective assistance of counsel, the petitioner must show "that his counsel's performance was deficient and that this deficient performance prejudiced his defense." U.S. v. Patten, 40 F.3d 774, 776 (5ᵣCir. 1994), citing Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to establish that counsel's performance was deficient, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the [petitioner] by the Sixth Amendment." Strickland, 466 U.S. at 688. To establish prejudice resulting from this deficiency, the petitioner must demonstrate that his counsel's errors were so serious as to render the proceedings unreliable and fundamentally unfair. Williams v. Taylor, 529 U.S. 362, 390 (2000); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). In this case, the petitioner has failed to make such a showing. The Strickland test, as applied to each of petitioner's ten contested grounds for appeal, fail to satisfy this standard warranting reversal and/or resentencing. Additionally, the government respectfully submits that there are no unresolved facts or issues warranting any evidentiary hearing.

**WHEREFORE**, the United States respectfully prays that Bradford's petition filed pursuant to 28 U.S.C. § 2255 be **DENIED**.

Respectfully submitted,

JIM LETTEN
UNITED STATES ATTORNEY

JOHN F. MURPHY
Assistant United States Attorney
Hale Boggs Federal Building
500 Poydras Street, Room 210-B
New Orleans, Louisiana 70130
Telephone: (504) 680-3126

**CERTIFICATE OF SERVICE**
I certify that a copy of the
foregoing has been served upon
counsel for all parties
by mailing the same to each,
properly addressed and postage
prepaid this_____ day of
_____, 20___

Assistant United States Attorney

## **AFFIDAVIT**

Parish of Orleans

State of Louisiana

Before me, the undersigned notary public, duly commissioned and qualified in the State of Louisiana, personally came and appeared Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Michael Eberhardt, who after being duly sworn, did depose and state:

1.     I was requested by Assistant United States Attorney John Murphy to investigate whether the attached 21 ATF firearms licensees ever manufactured handgun frames or receivers.

2.     This research was conducted by ATF personnel by contacting each of these 21 ATF firearms licensees and ATF has determined that none of these licensees has ever manufactured a frame or receiver for a handgun. A frame or receiver is the component that makes a weapon a firearm pursuant to Title 18, United States Code, Section 921(a)(3)(B). Entities, such as those on the attached list, often apply for ATF firearms licensees for reasons other than the manufacture of handgun frames and receivers. One of the main reasons to obtain an ATF manufacturing firearms license includes the

assembling and reworking of component parts of handguns, which is not the manufacturing

of handguns.

MICHAEL EBERHARDT
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Sworn to and subscribed before me, notary public, this _12_ day of November 2004.

NOTARY PUBLIC

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 01 | NOV- 8 | 11:52AM | 98417119 | 0:00:17 | 1 | OK | SG3 | 2370 |

(Petitioner's exhibit # 2)

841-7119

Please give to Mike Eberhardt

| Lic Cnt | Lic Cnty | Lic Type | Lic Xprdte | Lic Seqn | License Name | Street | City | State | Zip Code | Voice Phone |
|---------|----------|----------|-----------|----------|--------------|--------|------|-------|----------|-------------|
| 72 | 51 | 7 | 5H | 37007 | LADNERS INDUSTRIES CO | 4108 SANFORD ST | METAIRIE | LA | 700000000 | 5048237181 |
| 72 | 87 | 7 | 3X | 175 | BAYOU GUN REPAIR LLC | 220 REISS PL | CHALMETTE | LA | 70043 | 5044778504 |
| 72 | 51 | 7 | 4K | 244 | MERKS PRECISION LLC | 1901 COMMERCIAL DR #9 | HARVEY | LA | 70058 | 5043485404 |
| 72 | 55 | 7 | 5B | 3434 | FABAJUS, WILLIAM L | 915 KENTUCKY ST | NEW ORLEANS | LA | 701170000 | 5046694402 |
| 72 | 55 | 7 | 3J | 181 | SEIDEL, DANIEL FANNED | 2223 RORLEY DR | LAFAYETTE | LA | 70503 | 3378443064 |
| 72 | 55 | 7 | 5H | 731 | TACTICAL INNOVATIONS INC | 103 GOORWOOD CIR | LAFAYETTE | LA | 70508 | 3378767672 |
| 72 | 19 | 7 | 3L | 185 | ELLIOTT, GREGORY ALLEN | 2600 WESTWOOD DR | WESTLAKE | LA | 70665 | 3374817678 |
| 72 | 121 | 7 | 5C | 434 | MYERS, RICHARD MARLON II AND MYERS, CHARLES JASON | 2130 MILLER AVENUE | WESTLAKE | LA | 70669 | 3374129642 |
| 72 | 87 | 7 | 5D | 35721 | RODRIGUEZ, KEVIN JOSEPH | 142 N VAUGHN #C | BRUSLY | LA | 707190000 | 2252172408 |
| 72 | 77 | 7 | 5F | 825 | ESSENTIAL ARMS CO | 435 LEVEE ROAD | KROTZ SPRINGS | LA | 70310 | 3379450185 |
| 72 | 77 | 7 | 5A | 185 | RUMPHREYS, L D MONGERET, LEON & BEAUVS, T H | 319 FAIRFIELLOS AVE #8 | NEW ROADS | LA | 70760 | 2257184446 |
| 72 | 51 | 7 | 4G | 36721 | RUMMLER, JENS PETER | 5184 AUSTERLITZ LN | OSCAR | LA | 70762 | 5045274662 |
| 72 | 33 | 7 | 5J | 309 | PRECISION FIREARMS & INDOOR RANGE | 11426 CLOVERLAND AVE | BATON ROUGE | LA | 707620000 | 2257547264 |
| 72 | 33 | 7 | 5J | 714 | HAYDEN, WILLIAM M | 9378 S CHOCTOW | BATON ROUGE | LA | 70809 | 2252443707 |
| 72 | 15 | 7 | 5E | 12866 | KNOTTS, KENNETH L | 10375 HWY 155 | CASTOR | LA | 70819 | 3185782875 |
| 72 | 15 | 10 | 5L | 679 | KIILE, DENNIS | 2613 BELLEVUE RD | HAUGHTON | LA | 710160000 | 3185746477 |
| 72 | 119 | 7 | 5H | 802 | VALENTEC SYSTEMS INC | 2619 YORK AVE | MINDEN | LA | 71037 | 3184686122 |
| 72 | 15 | 7 | 5M | 13850 | CLARK CUSTOM GUNS INC | 336 SHOOTOUT LN | PRINCETON | LA | 71055 | 3189469844 |
| 72 | 73 | 7 | 6C | 840 | BRIGHAM & BRIGHAM DENTAL CORP | 2281 BENTON RD | BOSSIER CITY | LA | 710670000 | 3187429852 |
| 72 | 73 | 7 | 3J | 37009 | CHRISTMAN, DAVID H JR | 1206 1/2 RIVERSIDE DRIVE | MONROE | LA | 71111 | 3183862107 |
| 72 | | | | | | 116 RUNDELL LOOP RD | DELHI | LA | 717230000 | 3186781395 |